ORDERED.

Dated:  September 17, 2015

K. Rodney May
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
www.flmb.uscourts.gov

In re

CASEY MARIE ANTHONY,                    Case No. 8:13-bk-0922-KRM
                                        Chapter 7

      Debtor.
_____/

ZENAIDA GONZALEZ,

      Plaintiff,

v.                                      Adv. Pro. No. 8:13-ap-0626-KRM

CASEY MARIE ANTHONY,

      Defendant.
_____/

**MEMORANDUM OPINION**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND**
**DETERMINING PLAINTIFF'S DEFAMATION CLAIM TO BE DISCHARGEABLE**

INTRODUCTION

      *"And w*hen *they went and interviewed that girl down in Kissimmee, they never showed me a picture of her."*[1]

---

[1] From a video recording of Casey Anthony, talking to her parents while incarcerated in the Orange County Jail on July 25, 2008.  The parties did not provide a transcript; but, Ms. Anthony's attorney referred the Court to the video posted on YouTube, the viewing of which was not opposed by Plaintiff.  *See* Notice of Filing July 25, 2008, Jailhouse Conversation.  (Doc. No. 85).

By itself, this remark by Casey Anthony ("Debtor"), made to her parents nine days after being arrested in connection with the disappearance of her two-year old daughter, would appear to harm no one.  But, Zenadia Gonzalez ("Plaintiff") alleges in this adversary proceeding that she was the only person identifiable as the "girl down in Kissimmee," and that, when considered with surrounding circumstances, Debtor's statement implicated Plaintiff as being involved in the child's disappearance.  Plaintiff's defamation lawsuit was pending in Orange County Circuit Court ("State Court Case") when Debtor filed her Chapter 7 petition.[2]

It would be pointless, however, for the Plaintiff to prosecute the defamation claim if it is dischargeable in bankruptcy.  Accordingly, Plaintiff filed this adversary proceeding to obtain a determination that her claim arises from a willful and malicious injury and is therefore excepted from discharge, by operation of 11 U.S.C. § 523(a)(6).[3]

Debtor has moved for summary judgment, asking the Court to find that the above quoted statement (the "Statement") was not made with the intent or purpose to injure Plaintiff, as is required by § 523(a)(6).  Debtor further asks the Court to find that subsequent statements to the media by Debtor's mother, Cindy Anthony, are neither attributable to Debtor for purposes of non-dischargeability, nor made with the intent or purpose to injure Plaintiff.

After reviewing the record[4] and carefully considering arguments of counsel, the Court concludes that the content and context of the Statement do not support Plaintiff's allegation that

---

[2]  The Chapter 7 case was filed on January 25, 2013.  Debtor received her discharge on December 17, 2013 (Main Case Doc. No. 140).

[3]  Unless otherwise stated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

[4]  The record in this matter includes the following:

- The Debtor's written statement to Orange County Sheriff's investigators, on July 16, 2008 (Doc. No. 77-1).

2

the Statement was uttered with the intent or purpose to injure her.  The Statement was made only

to the Debtor's parents.  It was not a false statement about Plaintiff's person, character or

conduct.  The Statement was not targeted at Plaintiff.  It was a statement, either false or

mistaken, about the Orange County Sheriff's Office investigators failing to pursue Debtor's story

about a babysitter with whom Debtor claimed to have last seen her daughter.  During the same

conversation with her parents, Debtor gave a description of the babysitter, as a person having a

hyphenated last name ("Fernandez-Gonzalez"), and physical features that did not match those of

Plaintiff, whom she did not know.  For these same reasons, the Statement is not malicious as to

Plaintiff.  The later public comments by Debtor's mother do not show an intent to injure Plaintiff

and are not linked to any directive by Debtor to target or harm Plaintiff.  Thus, there is no legal

or factual basis to attribute the mother's statements to Debtor.  Therefore, the Debtor is entitled

to a discharge from Plaintiff's defamation claim.

---

- Transcript of Debtor's recorded interview with investigators, July 21, 2008 (Doc. No. 76-3).

- Video of Debtor's recorded conversation with her parents in Orange County Jail on July 25, 2008. (See Debtor's Notice of Filing of the link to YouTube video (Doc. No. 85).

- Deposition of Debtor's mother, Cindy Anthony, in the State Court Case, April 9, 2009 (Doc. No. 77-3).
- Defendant's Statement of Undisputed Facts, February 27, 2012, filed in the State Court Case (refiled in this adversary proceeding as Doc. No. 69).

- "Order on Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment," April 12, 2012, Circuit Judge Lisa T. Munyon, in Case No. 2008-CA-24573-0 (Doc. No. 76-7).

- Defendant's Affidavit in Support of Motion for Summary Judgment, dated April 25, 2014 (Doc. No. 70).

- Declarations of Debtor's mother, Cindy Anthony, filed in this adversary proceeding in support of the Debtor's Motion for Summary Judgment (Doc. No. 82).

- Deposition of Casey Marie Anthony in this adversary proceeding, January 23, 2014 (Doc. No. 81).

## FACTUAL BACKGROUND

In June 2008, Debtor's two-year old daughter, Caylee, went missing.  Nearly six months later, the child's body was found and Debtor was charged with her murder.  On July 5, 2011, Debtor was acquitted of the murder charge, but was convicted of, and served time in jail for, lying to law enforcement officials.  One of the lies she told them was that she had last seen her daughter on June 9, 2008, at the Sawgrass Apartments in Orlando, Florida,[5] when she had left her daughter with a babysitter named "Zenaida Fernandez-Gonzalez."[6]

Debtor did not report her daughter's disappearance for more than a month.  It was Debtor's mother, Cindy Anthony, who alerted authorities to Caylee's disappearance during a 911 call on July 15, 2008.  Debtor participated in a second 911 call later that day, in which she said that a babysitter, "Zenaida Fernandez-Gonzalez," had her daughter.[7]

On July 16, 2008, Orange County Sheriff's Office investigators questioned Debtor at her parents' home.[8]  The investigators again heard the "babysitter" story.  Debtor provided the hyphenated name and a physical description of the babysitter.

Investigators determined that no person named "Zenaida Fernandez-Gonzalez" lived at the Sawgrass Apartments in June 2008.[9]  But, on their own initiative, investigators searched the Sawgrass Apartments records and discovered that a person with the similar name of "Zenaida

---

[5]  In her deposition in this proceeding on January 13, 2014, the Debtor admitted that the story about dropping off her daughter at the Sawgrass Apartments on June 9, 2008, was not true.  Doc. No. 81 at 36, lines 11-18.

[6]  Doc. No. 76-3 at 2:21-25.

[7]  Doc. No. 76 at 4.

[8]  Doc. No. 76-3; Doc. 77-1 at 1-2.

[9]  Doc. No. 69-1 at ¶¶ 44-45; Doc. No. 76 at 5.

4

Gonzalez" (Plaintiff) had visited the complex several months earlier, on April 17, 2008. As a prospective tenant, she had filled out a guest card, but had never lived there.[10]

Investigators interviewed Plaintiff a single time, in Kissimmee, on July 16, 2008.[11] In a sworn statement, Plaintiff denied knowing Debtor or Caylee. Plaintiff also denied having worked for Debtor as a babysitter.[12] It is undisputed that Debtor and Plaintiff did not know each other.

Later that day, investigators accompanied Debtor to Universal Studios in Orlando, where she reversed her earlier claim that she was employed there. Debtor continued to assert, however, that she had last seen Caylee with the babysitter, "Zenaida Fernandez-Gonzalez."[13] Investigators then presented Debtor with photographs of about 50 women from a database and a photo of Plaintiff taken by investigators earlier that day.[14] Debtor did not identify Plaintiff as the babysitter.[15]

Investigators viewed surveillance video from the Sawgrass Apartments and concluded that Debtor had not been there on June 9, 2008.[16] Later on July 16, 2008, Debtor was arrested

---

[10] Doc. No. 76-2 at 3.

[11] Doc. No. 67 at 47; Doc. No. 69-1 at ¶¶ 56-60.

[12] Doc. No. 76-2 at 4.

[13] Doc. No. 69-1 at ¶¶ 49-50.

[14] Doc. No. 76-2 at 4; Doc. No. 76-4 at 60:18-61:4.

[15] Doc. No. 76-2 at 4.

[16] Doc. No. 69-1 at ¶ 46.

and charged with child neglect, making a false official statement, and obstructing a criminal investigation.[17]

Nine days later, on July 25, 2008, Debtor's parents visited her at the Orange County Jail.[18] The visit lasted about an hour and the conversation was recorded. About 51 minutes into the recording, Debtor's mother began to question Debtor about the babysitter. Debtor gave her mother a description of the babysitter's height, weight, skin color, and eye color. Her mother posed this rhetorical question: "I would think that if anybody around here knew her they would have come forward by now." Debtor agreed.

Then, the following exchange took place:

> "CINDY ANTHONY: Did anybody ask you to describe her and they did a composite drawing of her?
> CASEY ANTHONY: Not once. *And when they went and interviewed that girl down in Kissimmee, they never showed me a picture of her.* They never searched –
> CINDY ANTHONY: Well, they told us – they had told us that you couldn't pull her out of a line-up.
> CASEY ANTHONY: They're full of shit. I had told them multiple times find a sketch artist, show me pictures, show me something. I could point her out to you."[19] (emphasis added).

Debtor also complained to her parents that the investigators were not searching for the babysitter by her full, hyphenated name "Fernandez-Gonzalez."

Thereafter, Debtor's mother spoke to the media. In a deposition in the State Court Case in 2009, Plaintiff focused on one such public interview, conducted on July 28, 2008, where Cindy Anthony stated:

---

[17] Doc. No. 76-2 at 1; Doc. No. 69-1 at ¶ 52.

[18] Doc. No. 76 at 7, Doc. No. 85.

[19] Doc. No. 67 at 4-5 (emphasis added); Doc. No. 1 at ¶ 13; Doc. No. 76 at 7.

> *"Are they lying to us when they told us there's only one in Central*
> *Florida and she's in Kissimmee and because, you know, my daughter said*
> *that she didn't recognize her.  My daughter said they never showed her*
> *picture.  She said she didn't look at any line-ups."*[20]

Plaintiff contends that this statement was a republication of the Statement and accomplished

Debtor's purpose, through her mother acting as an agent, of implicating Plaintiff as a kidnapper

or murderer.[21]

Later, in September, 2008, Plaintiff sued the Debtor for defamation in the Orange County

Circuit Court.[22]  Eventually, both parties moved for summary judgment.[23]  On April 12, 2012,

Circuit Judge Munyon concluded:

> ". . . The plaintiff argues that this [jailhouse] statement implicates the
> plaintiff in the disappearance of defendant's daughter because the plaintiff
> was the only Zenaida Gonzalez interviewed in Kissimmee.  The plaintiff
> further argues that the statement implies that the plaintiff is the nanny in
> question and inferentially denies the previous exoneration.  Conversely,
> the defendant argues that the entire context of the conversation clearly
> shows that the plaintiff is not implicated by the defendant but is instead
> exonerated.  This statement is susceptible to two competing inferences,
> both of which are reasonable, thus this issue must be decided by a jury
> . . . ."[24]

The State Court Case remains pending; but, because of the Debtor's bankruptcy filing, it is

stayed by operation of Bankruptcy Code § 362(a).

---

[20]  Video recording played during the deposition of Cindy Anthony, in the State Court Case, on April 9, 2009.  Doc. No. 77-3 at 21 (tr. pp. 79, lines 16-24).

[21]  Doc. No. 1 at ¶ 15-19.

[22]  Doc. No. 67 at 2, Doc. No. 1 at 4.

[23]  Doc. No. 76-7.

[24]  Doc. No. 76-7 at 2.

In this adversary proceeding, Plaintiff seeks a determination, under § 523(a)(6), that her unliquidated defamation claim be excepted from discharge because the Statement was willful and malicious.[25]  Plaintiff contends that "[w]ith a statement such as this, any reasonable person would know that a person's character and reputation would be harmed by being branded as a kidnapper."[26]  Among other things, Plaintiff argues that:  (1) the parties are bound by the ruling in the State Court Case that the defamatory nature of the remark is to be decided by a jury; and (2) a "willful and malicious" injury, for purposes of the § 523(a)(6) exception to discharge, can result from the act of an "agent," in this case, Debtor's mother.

Debtor's motion for summary judgment focuses on the many physical differences between Plaintiff and Debtor's description of the babysitter.[27]  Debtor argues that Plaintiff cannot establish the elements of defamation because none of the statements about the babysitter were ever directed at Plaintiff; they could only have been about some other person (real or fictional) bearing no resemblance to Plaintiff.[28]  Debtor argues that Plaintiff cannot prove specific intent to injure the Plaintiff.[29]  And, she contends that § 523(a)(6) cannot apply to acts by third parties.

---

[25]  Doc. No. 1.

[26]  Doc. No. 76 at 11.

[27]  Doc. No. 67 at pp. 27-31.

[28]  Doc. No. 67 at 35-38.

[29]  Doc. No. 67 at 46.  Debtor also contends that Plaintiff could not have suffered any injury from the Jailhouse Statement because it was Plaintiff herself who voluntarily made public appearances for the media to talk about the supposed involvement in the disappearance of Caylee.

<u>ANALYSIS</u>

I.  <u>The Issue of Dischargeability is a Core Proceeding</u>

In this proceeding, Plaintiff's claim has been characterized generally as one for

"defamation," which would require proof of both a false statement about the claimant and actual

damages arising from the statement.[30]  The claim might also be tried as defamation by

implication, which would require proof of the juxtaposition of a statement, that may even be true,

to a series of facts that imply a defamatory connection between them.[31]  In either case, the

standard of liability would likely be one of negligence.[32]  The ruling was made in the State Court

Case that a jury must determine whether the Statement is defamatory under Florida law.

The issue of whether a creditor's claim is excepted from the Chapter 7 discharge,

however, arises from the Bankruptcy Code.  The determination of any exception to discharge is a

core proceeding in which this Court is the trier of fact.[33]  Even where a judgment of defamation

has been entered previously in another court, the claim will be excepted from discharge under

§ 523(a)(6) only if the bankruptcy court determines that the debtor acted willfully and

maliciously.[34]  Thus, it is within the province of this Court to determine, on the record before it,

---

[30]  The elements required to prove defamation are:  (1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) the party suffered damages as a result of the publication."  *Elbanna v. Captain D's, LLC,* 2009 WL 435051 (M.D. Fla. 2009); *Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008).

[31]  *Coton v. Televised Visual X-Ography, Inc.,* 740 F.Supp 2d 1299, 1314 (M.D. Fla. 2010) (finding that defendant's unauthorized use of plaintiff's self-portrait in connection with pornographic movie and related marketing materials constituted defamation by implication because the it improperly suggested an association with the pornography industry).

[32]  *Seropian v. Forman*, 652 So.2d 490, 494 (4th DCA 1995), *Della-Donna v. Gore Newspapers Co.*, 489 So.2d 72, 75 (Fla. 4th DCA 1986).

[33]  28 U.S.C. § 157(b)(2)(I).  The issue of dischargeability is distinct from (a) adjudicating the merits of a defamation claim itself or (b) estimating or liquidating the amount of such claim, either of which may have to be tried in another forum.  *See* 28 U.S.C. § 157(b)(2)(B) and (5).

[34]  If a state court defamation judgment is premised on findings of willful and malicious conduct that are congruent with the proof required by § 523(a)(6), then the doctrine of collateral estoppel would require application of those

9

whether Debtor intended to injure Plaintiff, or had reason to appreciate the substantial likelihood that Plaintiff would be injured, when she uttered the Statement.

II. <u>Summary Judgment Standard</u>.

Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[35]  Summary judgment is warranted when "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."[36]

Plaintiff did not offer any evidence to rebut Debtor's affidavit.  If there was any evidence weighing in her favor, she would have made it known to the Court in a motion for summary judgment, or in response to Debtor's motion for summary judgment.

---

same findings by the bankruptcy court.  *See e.g., In re Hill*, 265 B.R. 270, 276 (Bankr. M.D. Fla. 2001).  Otherwise, the determination of dischargeability will be made upon the record made later in the bankruptcy court.  *See, e.g., In re Kaunanui*, 2015 WL 359088 (Bankr. D. Haw. Jan. 2015) (a California judgment for defamation, without additional specific findings, did not establish that the defendant acted willfully and maliciously under Section 523(a)(6)); *In re Berlin*, 513 B.R. 430 (Bankr. E.D.N.Y. 2014) (because a finding of defamation could be made based on negligence under New York law, and the record from the state court proceeding was not clear as to the debtor's intent, the bankruptcy court determined that a hearing was necessary to determine whether the debtor's conduct was willful and malicious under § 523(a)(6)); and *In re Holland*, 428 B.R. 465 (Bankr. N.D. Ill. 2010) (bankruptcy court found that, even if the Plaintiff had a valid claim for defamation under state law, he had not demonstrated that the claim should be considered nondischargeable, due to failure to present evidence regarding falsity of the statement as required under § 523(a)(6).  But, see *In re George*, where my colleague, Judge Delano, found that the issue of malicious injury had been litigated in a state court "false light" claim because it was based on the same statements.  2012 WL 1229840 (Bankr. M.D. Fla., Apr. 11, 2012).

[35]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1996).

[36]  *Id.* at 322-23.

In addition to the authority to grant summary judgment *sua sponte*, the Court is also able to draw inferences, make findings of fact, and make determinations of witness creditability.[37] Furthermore, "[i]t is permissible for a trial court in a non-jury case to grant summary judgment if witness creditability is not at issue and trial would not enhance the court's ability to draw inferences and conclusions."[38]

The Court is satisfied that the record is sufficient to decide this matter without a trial. The Court has reviewed and considered the Statement and the entire conversation within which it occurred and the affidavits and deposition testimony of Debtor and her mother.  A trial would not add anything meaningful to aid the Court in deciding the dischargeability issue.

III.  Exception to Discharge for a Willful and Malicious Injury

Plaintiff must show, by a preponderance of evidence, that her claim arose from a "willful and malicious injury by the debtor . . . ."[39]  Both requirements must be proven.[40]

---

[37]  *In re French*, 2012 WL 1166248, *4-5 (M.D. Fla. Apr. 9, 2012); *Nunez v. Superior Oil Co*., 572 F.2d 1119, 1124 (5th Cir. 1978).

[38]  *Id.* at *4. As the Fifth Circuit explained in *Nunez v. Superior Oil Company* (which is precedent in the Eleventh Circuit under *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981):

> "If a decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though the decision may depend upon inferences to be drawn from what has been incontrovertibly proved.  Under those circumstances, which may be rare, the judge who is also the trier of fact may be warranted in [drawing a conclusion] even if that conclusion is deemed 'factual' or involves a 'mixed question of fact and law.' A trial on the merits would reveal no additional data.... The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial."

572 F. 2d 1119, 1124 (5th Cir. 1978).

[39]  11 U.S.C. § 523(a)(6).  *Grogan v. Garner*, 498 U.S. 279 (1991).

[40]  *See In re Levin*, 434 B.R. 910, 917 (Bankr. S.D. Fla. 2010); *In re Weiner*, 415 B.R. 900, 905 (Bankr. S.D. Fla. 2009) ("An injury alleged as the basis for a non-dischargeable claim under 11 U.S.C. § 523(a)(6) must be both willful and malicious.").

In considering the requirement of "willfulness," the Supreme Court, in *Kawaauhau v. Geiger*,[41] rejected the argument that reckless or negligent conduct, as alleged in that case for a medical malpractice claim, was sufficient for the § 523(a)(6) exception to discharge:

> "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional act that leads to injury.  Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described 'willful acts that cause injury.'  Or, Congress might have selected an additional word or words, *i.e.*, 'reckless' or 'negligent,' to modify 'injury.'  Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts.  Intentional torts generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.' Restatement (Section) of Torts § 8A, comment a, p. 15 (1964)."[42]

Thus, the injury itself must be intentional or deliberate; injuries that arise from accident, inadvertence, negligence or recklessness are not considered "willful" for the § 523(a)(6) exception to discharge.[43]  The Eleventh Circuit has added the refinement that an intended act may be considered "willful," but only if it is substantially certain to cause injury.[44]

As to the second requirement of § 523(a)(6), an injury is "malicious" when it is caused by conduct that is "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will."[45]  A showing of specific intent to harm another is not necessary and "[m]alice can be implied."[46]

---

[41]  523 U.S.  57 (1998).

[42]  *Id.*at 61-62 (emphasis in the original).

[43]  *In re Vestal*, 256 B.R. 326, 328-29 (Bankr. M.D. Fla. 2000).

[44]  *See Kane v. Stewart Tilghman Fox & Bianchi, P.A. (In re Kane)*, 755 F.3d 1285, 1293 (11th Cir. 2015); *Thomas v. Lovelass (In re Thomas)*, 288 Fed. Appx. 547, 549 (11th Cir. 2008).

[45]  *Id.* at 1294.

[46]  *Id.*

A.    Debtor's Statement To Her Parents Does Not Manifest an Intent to Injure Plaintiff.

It has been suggested that, in cases like this where there is no physical injury, courts should apply a "subjective" standard requiring proof of what the debtor actually knew, as distinguished from an objective standard, requiring proof only that the debtor's act was substantially certain to cause injury.[47]  Where the harm is not a physical injury, "a purely objective substantial certainty analysis would bring the court dangerously close to the recklessness standard . . . [and] using a subjective standard for substantial certainty avoids this risk."[48]  Although this view has not been endorsed by the Eleventh Circuit,[49] the Court concludes, as discussed below, that Debtor prevails under either standard of proof.

The facts are not in dispute.  Debtor did not know Plaintiff.  Debtor consistently described the babysitter as someone with a hyphenated surname and physical characteristics that did not match those of Plaintiff.  Plaintiff became involved in the investigation, not because Debtor identified her, but because investigators came upon her similar name among the Sawgrass Apartments' guest cards.[50]  Without this coincidental connection, investigators likely would not have questioned Plaintiff.

In her affidavit and 2014 deposition,[51] Debtor denied that she intended to injure Plaintiff and avers that the Statement was not directed at Plaintiff.  Debtor states that she made the

---

[47]  *In re Kane*, 470 B.R. 902, 941-42 (Bankr. S.D. Fla. 2011), *aff'd*, *In re Kane*, 755 F.3d 1285 (11th Cir. 2014).

[48]  *In re Levin*, 434 B.R. at 920.

[49]  *In re Kane*, 755 F.3d at 1293 (11th Cir. 2015).

[50]  There is no proffer of evidence that the Debtor saw the guest card or derived her description of the babysitter from it.

[51]  Doc. No. 70 at 3.

Statement out of frustration with her mother's questioning the details of the babysitter story.[52]  In the recorded conversation, she expressed frustration with investigators whom, she claimed, were not following up on the leads she had provided about the babysitter.[53]  There is no proffer of evidence rebutting Debtor's sworn statements that she had no intent or purpose to injure Plaintiff or have her mother do so.  The Court's review of the entire hour-long July 25, 2008, conversation leads to the conclusion that Debtor's statements under oath are credible, because they are consistent with the material facts surrounding the Statement.

There is insufficient proof, as well, that the utterance of the Statement was substantially certain to injure Plaintiff, even if she was the person to whom Debtor was referring in the Statement.  The Statement was made privately to Debtor's parents.  It was not a falsehood about Plaintiff, or about her character or conduct.  The Statement was made in the context of a complaint to Debtor's parents about investigators declining to show additional photographs or make a sketch artist available.  It does not appear that the Statement was made deliberately; this single reference to the "girl down in Kissimmee" was blurted out by Debtor in response to her mother's questions.

In her July 28, 2008, conversation with her parents, Debtor made two references to *"her."*  But, both references more plausibly refer to the described babysitter, not to the "girl down in Kissimmee."  Debtor had already agreed with her mother that "if anybody around here knew her they would have come forward by now," indicating that "the girl down in Kissimmee," having already been interviewed, was not the babysitter.  If Debtor had sat with a sketch artist,

---

[52]  Doc. No. 70 at 3.

[53]  Doc. No. 85.

the resulting drawing would have corresponded to Debtor's previous description, which would not have resembled Plaintiff.  The same logic applies to the request for the line-up.

There is no doubt that the Statement was erroneous.  Debtor had been shown a photo of Plaintiff on July 16, when she declined to identify her as the babysitter.  Plaintiff maintains that the Statement undid this previous "exoneration" and reestablished Plaintiff as a child kidnapper or murderer.

But, Plaintiff's claim is exaggerated.  Debtor never accused Plaintiff of anything.  In the State Court Case, Judge Munyon noted that "[b]oth parties agree that the defendant did not implicate this plaintiff in the disappearance of the child in the July 16, 2008, statements to law enforcement."[54]  There was no need for any exoneration in the first place.

The Statement seems to have had no effect on investigators' view of Plaintiff as not being involved in Caylee's disappearance.  Plaintiff was interviewed by investigators only once, on July 16, 2008; she was never arrested or detained.  It is a reasonable inference that investigators had concluded, by the time the Statement was made, that Debtor's story about the babysitter was untrue.

B.     The Statement was Not Malicious as to Plaintiff

Debtor has admitted that the babysitter story was untrue.  In a general sense, lying to law enforcement investigators would be "wrongful and without just cause?"  But, Debtor's fabricated version of events did not implicate Plaintiff in the disappearance of the child.[55]  The issue is

---

[54]  Doc. No. 76-7 at 3.

[55]  *Id.*

whether the later utterance of the Statement, assuming Plaintiff could prove any injury caused by it,[56] was wrongful and without just cause.

There is no established test by which to determine, in the absence of ill-will or physical injury, when wrongful conduct rises to the level of being "malicious."  Accordingly, this Court has considered whether utterance of the Statement involves a level of aggravated facts in excess of recklessness.[57]  In cases where a defamation judgment has been obtained, pre-bankruptcy, some courts have required a finding of the debtor's knowledge of the falsity of the statement before excepting the defamation claim from discharge.[58]  In cases under §523(a)(6) involving conversion of collateral, or financial injury, courts have required proof of debtor's knowledge or consciousness of wrongdoing.[59]  Some courts have required proof that the wrongful conduct was targeted at the creditor. [60]

---

[56] Plaintiff submitted no proffer of evidence on what injury she suffered or how it may have been caused by the Statement.

[57] *See In re Long,* 774 F.2d 875, 881 (8th Cir. 1985).

[58] *Compare Kasler v. Industrie Aeronautiche E. Meccaniche Rinaldo Piaggio S.P.A. (In re Kasler)*, 611 F.2d 308, (9th Cir. 1979), *Fincher v. Holt (In re Holt)*, 173 B.R. 806 (Bankr. M.D. Ga. 1994), and *Martell v. Voltolini (In re Voltolini)*, 48 B.R. 199 (Bankr. D. Mass. 1985) with *Wheeler v. Laudani*, 783 F.2d 610 (6th Cir. 1986).  *See also In re Thompson*, 162 B.R. 748 (Bankr. E.D. Mich. 1993).

[59] *See e.g., In re Stanley,* 66 F.3d 664, 668 (4th Cir. 1995) (court found malice requirement was satisfied where debtor knew increase in line of credit from $8,000 to $80,000 was a mistake, but used the whole line of credit despite knowledge of the mistake); *In re Esfahani,* 2010 WL 3959607 (Bankr. M.D. Fla. Sept. 22, 2010) (court found cause of action for willful and malicious injury existed where debtor knowingly collected rent from tenants and used the money collected for his own purposes instead of making mortgage payments because the debtor knew that his actions would result in injury to the plaintiffs.); *In re Cardillo*, 39 B.R. 548, 550 (Bankr. D. Mass. 1984) (court found that debtor committed a willful and malicious injury when he traded vehicle securing bank's loan for another vehicle to be co-owned with his sister without consent of the Bank or notification to the bank because he knew of the bank's security interest and had knowledge that Bank's lien needed to be satisfied).

[60] *See, e.g., In re Caruth*, 2002 WL 1770523 (Bankr. N.D. Iowa 2002) (holding that malicious conduct as to an injury to property under §523(a)(6) must be targeted at the creditor and finding none where debtor sold collateral and used the proceeds to pay bills).

Such formulations, requiring consciousness of wrongdoing, are consistent with Eleventh Circuit precedent.  In *In re Kane*, the Eleventh Circuit panel affirmed the bankruptcy court's finding of malice, by implication, where the debtor attorneys' had secretly released their clients' bad faith claims against an insurer, even though they knew that other law firms (creditors) had been engaged, on a contingent fee basis, to prosecute the same bad faith claims and were negotiating with the insurer to settle them at a higher amount.[61]  By negotiating in secret, the Kanes enriched themselves while knowing that the creditor firms would be damaged by the loss of their contingent fees.[62]  Thus, the law firms' claims were excepted from the Kanes' discharges.  In *In re Jennings*, the Eleventh Circuit panel affirmed a finding of malicious conduct under §523(a)(6) where it was established that Ms. Jennings understood enough facts to "know" that her conduct (executing documents to effect a fraudulent transfer from her ex-husband to another of his ex-wives to hinder a creditor's recovery against him on a personal injury claim) was wrongful and unjustified.[63]

The Court has considered the totality of circumstances surrounding the Statement and concludes that Debtor had no consciousness of wrongdoing, even by implication, when she made the Statement.  The Statement was not deliberated; there was no ill-will between Debtor and Plaintiff when the Statement was made; the Statement was made by Debtor only to her parents without any instruction to republish it; the Statement was not false as to Plaintiff, her character or her conduct; the Statement was not directed at Plaintiff; and it was not substantially certain that

---

[61]   755 F.3d at 1295.

[62]   *Id.*

[63]   670 F.3d at 1334.

utterance of the Statement would injure Plaintiff.[64]  Thus, the Statement was not malicious as to Plaintiff.

C.    Public Comments by Cindy Anthony

Plaintiff claims that she was defamed by the Debtor, on an agency theory, through Cindy Anthony's comments to the media.  Unlike the Statement by Debtor, Cindy Anthony's later references to "her" and "she" in the public statement on July 28, 2008, likely do refer to the "girl down in Kissimmee."  But, Debtor denies ever directing her mother to say that, or anything else, about Plaintiff.  At no point in the hour-long July 25, 2008, conversation did Debtor ask her mother to say anything to the public about the "girl down in Kissimmee."  Cindy Anthony's July 28, 2008, statement to the media (e.g. "are they lying when they told us there's only one in Central Florida and she's in Kissimmee"), is susceptible to the interpretation, which this Court adopts,  that investigators were not searching beyond the one person they had already interviewed."[65]

Plaintiff's agency theory is legally deficient, as well.  Section 523(a)(6) expressly requires that the willful and malicious injury be committed "by the debtor."  In *In re Nofziger*, the bankruptcy court declined to find a debt to be excepted from discharge where the debtor's alleged involvement was having participated in a conspiracy with the creditor's ex-wife to defame him:

---

[64]  Although it seems odd that Debtor would conjure up a name similar to Plaintiff's and link it to the Sawgrass Apartments which  Plaintiff had visited, there is no evidence that Debtor and Plaintiff had ever crossed paths prior to July 25, 2008, or that Debtor had seen the Sawgrass Apartments guest cards.  In her deposition, Debtor acknowledges that she had visited a friend who lived at the Sawgrass Apartments; but Debtor claimed that it had been two years earlier (presumably 2006) since she had been there.  Doc. No. 81, at 35-37.

[65]  Doc. No. 82-2.  In a declaration filed in the State Court Case, Cindy Anthony explained that she thought at that time that investigators were "looking in the wrong place."  Doc. No. 82 at ¶ 14.

"Each of these examples illustrate the basic principle – that, in order to find a debt nondischargeable under § 523(a)(6), the debtor directly must commit some type of malicious, intentional tort which the debtor knew would cause harm to the creditor.  A conspiracy, i.e., an agreement, to commit a tort or other wrong does not qualify.  Actions taken against parties *other* than the claimant do not qualify.  Nor does action taken by someone other than the debtor qualify.  *See In re Eggers*, 51 B.R. 452, 453 (Bankr. Tenn. 1985) (Section 523(a)(6) excepts from discharge a willful and malicious injury by the debtor to another entity.  The legislative history accompanying § 523(a)(6) indicates that a debt is nondischargeable only where injury has resulted from some deliberate or intentional act *of the debtor*. . . (emphasis in original).  Simply stated, a co-conspirator's acts cannot suffice to establish the elements of Bankruptcy Code Section 523(a)(6), unless the acts were taken directly by the debtor against the objecting creditor.  Participation in a conspiracy is not enough to establish the intentional wrong needed to make a debt nondischargeable."[66]

This reasoning is persuasive.  The cases cited by Plaintiff, are not, because they involve a different exception to discharge for debts arising from false pretenses, false representation or fraud, under § 523(a)(2) which omits the modifier "by the debtor." [67]

CONCLUSION

Plaintiff has argued that Debtor as an inherently untruthful person.  The Court has considered the fact that the entire babysitter story was a lie.  The Court has also considered Debtor's conviction for making false statements to law enforcement and her combative refusals to answer a number of questions in her deposition in this proceeding.[68]  Nevertheless, there is nothing in the Statement (or in the entire hour-long conversation on July 25, 2008) to support Plaintiff's allegations that Debtor intended to portray Plaintiff as a child kidnapper and potentially a child killer, or that Debtor intended to subject Plaintiff to heightened police and

---

[66]  361 B.R. 236, 243 (Bankr. M.D. Fla. 2006).

[67]  *In re Savage,* 176 B.R. 614 (Bankr. M.D. Fla. 1994) (citing *In re Powell*, 95 B.R. 236 (Bankr. S.D. Fla. 1989); *aff'd* 108 B.R. 343 (S.D. Fla. 1989); *aff'd* 914 F.2d 268 (11th Cir. 1990).

[68]  Doc. No. 76 at 4-6.

media scrutiny.  Debtor's statements under oath on the points at issue here are supported by the content and context of the Statement.  There is no proffer of evidence to the contrary.

The public may have a well-formed opinion about Debtor, based on the tragic events in 2008 and the televised murder trial.  But, the Debtor was acquitted of the aggravated charges and has served time for providing false information to law enforcement.  She appears in this Court, like other debtors, entitled to a discharge from her debts unless a creditor can prove, by a preponderance of evidence, that an exception to the discharge applies.

The Court concludes the evidence is not sufficient to prove that Debtor intended to injure the Plaintiff or harm her reputation, or that Debtor acted with malice when she blurted out the reference to the "girl down in Kissimmee" in response to her mother's questions in their private conversation.  This one reference was made by Debtor within an hour-long conversation in which Debtor also described the "babysitter" in terms that did not point to Plaintiff.  Thus, it was not substantially certain that the Statement would injure Plaintiff.  Accordingly, Debtor's utterance of the Statement was neither willful, nor malicious, as required by § 523(a)(6).  The later public comments by Debtor's mother do not show an intent to injure Plaintiff and are not linked to any directive by Debtor to target or harm Plaintiff.  Additionally, because § 523(a)(6) requires an act by the debtor, Cindy Anthony's comments to the media cannot form the basis to bar the Debtor's discharge.

Therefore, a separate order will be entered granting summary judgment for Debtor and Plaintiff's unliquidated defamation claim will not be excepted from Debtor's discharge.


Clerk's Office to Serve